## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IN RE APPLICATION OF | ) | |
| | ) | |
| TELE FÁCIL MÉXICO, S.A. DE C.V., | ) | Misc. Action No.: _____ |
| | ) | |
| FOR AN ORDER PURSUANT TO 28 U.S.C. | ) | |
| § 1782 TO CONDUCT DISCOVERY FOR USE | ) | |
| IN A FOREIGN PROCEEDING | ) | |
| | ) | |

## STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF TELE FÁCIL MÉXICO, S.A. DE C.V.'S APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 TO CONDUCT DISCOVERY FOR USE IN A FOREIGN PROCEEDING

Pursuant to 28 U.S.C. § 1782 and Federal Rules of Civil Procedure 26, 30, 34, and 45, Applicant Tele Fácil México, S.A. de C.V. ("Tele Fácil") applies for leave to serve subpoenas to appear for depositions on: (a) Mr. Timothy J. Feighery; (b) Mr. Lee M. Caplan; and (c) Mr. Ernesto Mendieta Márquez (collectively, "Witnesses"). The requested subpoenas seek evidence for use in a criminal complaint to be filed by Tele Fácil before the Mexican Attorney General ("Criminal Complaint"), in connection with alleged criminal acts by or at the direction of certain employees of the *Instituto Federal de Telecomunicaciones* ("IFT").

As discussed below, Joshua D. Nelson and Jorge Blanco, U.S. citizens and majority shareholders of Tele Fácil, initiated on their own and on behalf of Tele Fácil a proceeding pursuant to Chapter 11 of the North American Free Trade Agreement ("NAFTA") with the purpose of redressing damages suffered to their investment in Mexico due to actions by the IFT. The NAFTA Proceeding claim states that the IFT reversed its own actions and illegally expropriated rights previously granted to Tele Fácil, in order to favor the incumbent telecommunications company in the country, Teléfonos de México, S.A.B. de C.V. ("Telmex"). A former high-level officer of the IFT, Mr. Gerardo Sánchez Henkel ("Mr. Henkel"), who has

first-hand knowledge of the events since he was the Head of the Enforcement Unit at the IFT at

the time the relevant events happened, indicated that he was willing to be a witness in the

NAFTA Proceeding in order to expose the IFT's corruption.

For this reason, on September 7 and 8, 2017, Mr. Henkel met with the Witnesses in

Washington, D.C., to discuss the events as they happened within the IFT. During that meeting,

as will be further described herein, a witness statement draft was prepared to which Mr. Henkel

agreed. However, some days later, before the statement was signed and submitted in the

NAFTA Proceeding, Mr. Henkel contacted Tele Fácil's counsel in Mexico City and said he

could no longer cooperate. Mr. Henkel stated that he received calls by individuals within the IFT

threatening him and his family in case he decided to participate as a witness in the NAFTA

Proceeding. Tele Fácil has prepared and intends to submit a Criminal Complaint before the

Mexican Federal Attorney General to inform the competent authority of these facts and to start a

criminal investigation in connection with the crimes, among others, of witness tampering and

intimidation. The Witnesses participated in the meeting with Mr. Henkel and the drafting of the

witness statement, and would possess both documentary evidence and direct knowledge

regarding this issue.

This Court should grant Tele Fácil's request for discovery pursuant to Section 1782.

Jurisdiction is proper under Section 1782. Venue is proper because the Witnesses can be found

in the District of Columbia as described below in Section II.A.1. Moreover, this Court has the

authority to grant Tele Fácil's request and should, in its discretion, use that authority to permit

discovery. Tele Fácil may submit its Application *ex parte* because (a) the parties from whom

discovery is sought do not object to the discovery and (b) the rights of those parties may be fully

protected from discovery through either a motion to quash or defense against a motion to compel compliance.

In support of this Application, Tele Fácil has provided: a Proposed Order; a Declaration of Mr. Rodolfo Félix Cárdenas, Mexican criminal counsel to Tele Fácil ("Felix Decl."); and a Declaration of Louis J. Rouleau of Womble Bond Dickinson, LLP., counsel to Tele Fácil ("Rouleau Decl."), with Exhibits 1-10 attached thereto, including: a Subpoena to Mr. Feighery to Testify at a Deposition for Use in a Foreign Proceeding (Exhibit 1); a Subpoena to Mr. Caplan to Testify at a Deposition for Use in a Foreign Proceeding (Exhibit 2); a Subpoena to Mr. Mendieta to Testify at a Deposition for Use in a Foreign Proceeding (Exhibit 3); a screenshot from Arent Fox LLP's website showing the address of the firm's Washington D.C. Office (Exhibit 4); a screenshot from Mr. Feighery's attorney webpage on Arent Fox LLP's website (Exhibit 5); a screenshot from Mr. Caplan's attorney webpage on Arent Fox LLP's website (Exhibit 6); a screenshot from Innovista Law PLLC's website showing the address of the firm's Washington D.C. Office (Exhibit 7); a screenshot from Mr. Mendieta's attorney webpage on Innovista Law PLLC's website (Exhibit 8); a letter by Mr. Feighery indicating applicable policies of his law firm to depose an attorney of Arent Fox (Exhibit 9); a letter by Mr. G. David Carter indicating applicable policies of his law firm to depose an attorney of Innovista Law (Exhibit 10).

I.      **BACKGROUND**

    A.      **THE NAFTA PROCEEDING**

    The NAFTA Proceeding was initiated by two of Tele Fácil's three shareholders, on their own and on behalf of Tele Fácil, to challenge certain actions taken by Mexico's telecommunications regulator, the IFT, that destroyed Tele Fácil's investments in the country,

including their right to provide telecommunications services.

Under the NAFTA Proceeding, Tele Fácil claims that after officially recognizing and expressly validating Tele Fácil's legitimate investment rights in a lengthy, reasoned and unanimous resolution, the IFT later abruptly, unjustifiably, and illegally repudiated its own rulings. The IFT's unjustifiable actions clearly benefitted — and were influenced by —Mexico's incumbent, dominant and largest provider of fixed telecommunications services, Telmex.

Because of Telmex's dominance in the Mexican telecom sector, it was essential for Tele Fácil to interconnect with Telmex in order to access the Mexican telecom market. Consequently, on August 7, 2013, Tele Fácil requested interconnection with Telmex, which initiated the process of negotiation between the two parties on the terms of that interconnection.

In response to Tele Fácil's overture, Telmex offered Tele Fácil its standard framework agreement for interconnection through 2017. This agreement included the all-important pricing terms, which established the interconnection rate at a very high rate, equivalent to USD 0.00975 per minute, per call. During negotiations, the parties reached agreement on all of the terms for interconnection (including the rates), except for two. The first was Telmex's refusal to interconnect indirectly. The second was Telmex's refusal to eliminate number portability charges.

Pursuant to the Mexican telecommunications law, Tele Fácil then brought the contract before the IFT so that the IFT could decide the disputed terms and order the execution of the agreement and physical interconnection. The IFT did so, in a unanimous decision – P/IFT/261114/381 ("Resolution 381") – issued on November 26, 2014.

In Resolution 381, the IFT decided the disputed terms in Tele Fácil's favor and, by recognizing the sanctity of freedom of contract between private parties on the already-agreed

terms, established the existence of a complete interconnection agreement.  On this basis, the IFT

ordered Telmex and Tele Fácil to implement its ruling, execute the interconnection agreement,

and interconnect their networks within ten business days of the ruling.

In the meantime – that is, between August 7, 2013, the date Tele Fácil first requested

interconnection with Telmex, and November 26, 2014, the date the IFT issued Resolution 381 –

long overdue reforms of the Mexican telecom sector became law and began to be implemented.

As one of the measures designed to reduce Telmex's dominance over the Mexican

telecommunications market, on March 6, 2014, the IFT identified and declared Telmex a

"predominant economic agent."  This permitted the IFT to impose "asymmetric regulations" on

Telmex.  On August 13, 2014, the new Mexican telecommunication law became effective (the

Federal Telecommunications and Broadcasting Law, or "FTBL"), replacing the old Federal

Telecommunications Law ("FTL").  As part of the FTBL, the Mexican Congress strengthened

the asymmetric regulations by requiring Telmex to charge only a "zero rate" for call termination

in its network.  At the same time, it allowed the competing carriers to continue charging Telmex

the rate they had already agreed between themselves and the incumbent.

As a result of these and other developments, Telmex clearly realized that the

interconnection agreement established by the IFT in Resolution 381 would result in Telmex

losing substantial amounts of money.  Telmex then acted to erase Resolution 381 using the full

weight of its influence within the IFT.  As later discovered by Tele Fácil, these steps included

causing the IFT Commissioners, its Compliance Unit, and its Legal Unit, to undertake a series of

secret and unprecedented procedural steps to repudiate Resolution 381.  The die was cast at an

IFT meeting that took place on or about January 15, 2015 when the IFT's Chairman set in

motion a plan to reverse Resolution 381 in order to benefit Telmex.

Between the date of Resolution 381 (November 26, 2014) and this date in mid-January 2015, Tele Fácil did all that it could to secure Telmex's compliance with the provisions of the IFT's resolution, but to no avail. Even after several requests and meetings with the IFT, no enforcement action was carried out to implement Resolution 381.

Instead of enforcing its own ruling, on February 10, 2015, the IFT's Compliance Unit, headed by Mr. Henkel, requested a "confirmation of criteria" from the IFT's Legal Unit asking the scope of Resolution 381. This was unprecedented; there is no legal authority that permits the Compliance Unit to issue a confirmation of criteria to another unit in lieu of enforcing IFT orders. As if on cue, on February 18, 2015, Telmex itself sought a confirmation of criteria from the IFT, this time, incredibly, to confirm whether the rate term ordered in Resolution 381 should be contained in the interconnection agreement with Tele Fácil. The stage was now set for the IFT to improperly reverse course, and by that contrived, illegal process, undo Resolution 381.

On April 8, 2015, the IFT concluded Decree P/IFT/EXT/080415/77 ("Decree 77"). In Decree 77, a slim 4-3 majority of the IFT's Commissioners voted to take the unprecedented and illegal step of clawing back the rights that were previously guaranteed to Tele Fácil in Resolution 381. The IFT not only refused to enforce the initial resolution, but it also illegally revoked critical aspects of it through a blatant abuse of the administrative process.

In Decree 77, the IFT purportedly "interpreted" the scope of Resolution 381 to include only the IFT's decision on disputed terms, i.e., indirect interconnection and portability charges. Shockingly, it stated that it lacked authority to recognize and enforce terms that were previously agreed between the parties (that is, the terms that were undisputed). In other words, the IFT found that all interconnection terms, except those relating to indirect interconnection and portability charges, were no longer binding on the parties.

6

By this decree, the IFT destroyed what Tele Fácil had after Resolution 381: a complete set of valuable interconnection terms with Telmex. Now, Tele Fácil had nothing but two isolated terms and a non-existent agreement. It was left completely exposed to Telmex's predatory tactics.

Indeed, Telmex acted quickly to take advantage of Decree 77. On June 16, 2015, Telmex submitted a new interconnection disagreement to the IFT, claiming that a disagreement with Tele Fácil existed regarding, among other things, the applicable interconnection rates for 2015. Telmex knew that it could start again from square one. On October 19, 2015, a majority of the IFT – once again against the views of dissenting Commissioners – resolved Telmex's manufactured interconnection disagreement in Telmex's favor. In reiterating the majority rulings in Decree 77, the IFT added a new twist: it now ruled that the original interconnection agreement had *never existed*. The IFT also determined the applicable interconnection rates for 2015 in Telmex's favor. Despite Resolution 381, the IFT now found that the applicable interconnection rate was Mexican pesos ("MXN") 0.004179 per minute of use (USD 0.000253 per minute of use), approximately *one fortieth* of the rate previously agreed to between the parties and approved by the IFT (USD 0.00975 per minute of use). Thus, after destroying Tele Fácil's right to a high rate through 2017 in Decree 77, which only Telmex would be obliged to pay due to the new asymmetric rules and the FTBL, the IFT now replaced it with a low rate for 2015, a process that could be repeated with respect to 2016 and 2017 rates.

The IFT's about-face is impossible to understand from a legal perspective: the IFT's later rulings violate a fundamental tenet of Mexico's telecommunications law requiring "prompt and effective" interconnection between telecommunications providers in the public interest. The IFT's about-face is also impossible to understand from a policy perspective: the IFT's

repudiation had the intended effect of protecting Telmex, the declared dominant player in Mexico's telecommunications sector, from new entrants in the market like Tele Fácil.

The impact of the IFT's gross misconduct on Tele Fácil's business prospects in Mexico was immediate and devastating. The IFT's conduct was so unjustifiable, egregious, and blatantly confiscatory as to give rise to multiple breaches of the NAFTA protection to foreign investment. IFT's actions denied Tele Fácil fair and equitable treatment under the minimum standard of treatment and unlawfully expropriated Tele Fácil's investments in Mexico in their entirety.

The IFT's actions have caused Tele Fácil significant damages, which Tele Fácil seeks to recover through the NAFTA Proceeding. In total, the quantum of damages claimed by Tele Fácil in this matter exceeds $472 million USD.

## B.   MR. HENKEL AND TELE FÁCIL'S CRIMINAL COMPLAINT

While Tele Fácil was preparing its statement of claim for the NAFTA Proceedings, which was due on November 7, 2017, it obtained information from its external Mexican counsel, Mr. Carlos A. Bello, of Bello, Gallardo, Bonequi, Garcia, S.C., that on August 24, 2017, he had met for breakfast with Mr. Henkel. As previously mentioned, Mr. Henkel worked as Head of the Compliance Unit of the IFT during 2015 and was directly involved in the IFT proceedings involving Tele Fácil.

Mr. Henkel commented to Mr. Bello in that meeting that there were several acts during the process leading to Resolution 381 and Decree 77 contrary to the normal legal processes carried out by the IFT in direct harm of Tele Fácil's interests. These actions included illegal *ex parte* communications by the IFT with Telmex to resolve the issue in Telmex's favor. Such communications were successful and the IFT issued Decree 77.

Due to the relevance of the information obtained, Tele Fácil's external U.S. counsel decided to hold a face-to-face meeting with Mr. Henkel.

On September 7, 2017, Mr. Henkel and Mr. Bello travelled together from Mexico City to Washington, D.C. to meet with Tele Fácil's counsel to explain the circumstances under which Decree 77 was issued.

On September 7 and 8, 2017, a series of meetings were held at which the Witnesses were present. The meetings were held on September 7 at Tabard Inn, a Washington D.C. restaurant, and on September 8 in a meeting room at the Washington, D.C. offices of Arent Fox LLP.

During the meetings held in Washington, D.C., Mr. Henkel disclosed that he was convened to a meeting in mid-January 2015 in the office of the IFT Chairman, Gabriel Oswaldo Contreras Saldivar, to discuss Telmex's concerns about enforcement of the interconnection agreement between Telmex and Tele Fácil. At this meeting, the Chairman instructed Mr. Henkel not to enforce Resolution 381, even though he was required to do so by law, and instead to request an opinion from the Legal Unit as to whether physical interconnection could be enforced without execution of the interconnection agreement. This would give the Chairman and his allies an opportunity to unwind Resolution 381 in the form of an interpretive opinion, and this is what in fact transpired with Decree 77.

Based on the information provided by Mr. Henkel, Tele Fácil's counsel proposed during the meeting that he testify as a witness in the NAFTA Proceeding, and he tentatively agreed. Mr. Henkel was at the time participating in the selection process for an open position as an IFT Commissioner, and said he would have to wait a couple of weeks before making a determination, since he wanted to know the results of the selection process in order to avoid any conflict of interest.

Based on Mr. Henkel's statements at the meeting, Tele Fácil's counsel prepared a first draft of the witness statement for Mr. Henkel to participate as a witness in the NAFTA Proceeding.  The draft statement was reviewed by Mr. Henkel on that same day and he generally approved the statement and agreed with the information contained therein.

However, on October 25, 2017, and after knowing that he had not been selected as a candidate to fill the open position as IFT Commissioner, Mr. Henkel informed Mr. Bello that he could not sign the witness statement or be involved in the NAFTA Proceeding.  Mr. Henkel informed Mr. Bello that public officers from the IFT and the Federal Ministry of Communications told him not to appear in the Arbitration as a witness, threatening financial repercussions, such as, causing his brother to lose his Notary Public license, causing his son to lose his job at a prestigious law firm in Mexico, and preventing Mr. Henkel from finding any future employment with the Government of Mexico.

## C.    TELE FÁCIL'S CRIMINAL COMPLAINT

Due to the intimidation suffered by Mr. Henkel, on December 7, 2017, Tele Fácil engaged Mexican criminal attorney Rodolfo Félix Cárdenas, from law firm Felix Cardenas, S.C., in order to submit a Criminal Complaint before the Mexican Attorney General to initiate an investigation on the alleged intimidation and witness tampering.

Tele Fácil is preparing to file a Criminal Complaint that will be submitted and is gathering supporting evidence to present to the Mexican Attorney General's office.  The evidence to be obtained from the Witnesses' depositions requested herein would allow Tele Fácil to support its Criminal Complaint, and provide extremely valuable evidence for the Mexican authorities in charge of the investigation.

### D.   THE WITNESSES

Mr. Feighery is a partner in the Washington, D.C. office of Arent Fox LLP.  Rouleau

Decl., Ex. 5.  Mr. Caplan is a partner in the Washington, D.C. office of Arent Fox LLP. Rouleau

Decl., Ex. 6.  Arent Fox LLP is located at 1717 K Street, NW, Washington, D.C. 20006.

Rouleau Decl., Ex. 4.  Mr. Mendieta is employed as a Foreign Legal Consultant in the

Washington, D.C. office of Innovista Law PLLC.  Rouleau Decl., Ex. 8.  Innovista Law PLLC is

located at 1825 K Street, NW, Washington, D.C. 20006.  Rouleau Decl., Ex. 7.

Tele Fácil knows that Mr. Feighery, Mr. Caplan, and Mr. Mendieta participated in the

meetings with Mr. Henkel and believes they have in their possession, custody, or control

evidence and direct knowledge of facts going to the heart of the Criminal Complaint.  Mssrs.

Feighery, Caplan, and Mendieta have agreed to be deposed; however, their law firms' policies do

not permit an attorney to testify without a subpoena.  *See* Rouleau Decl., Exs. 9-10.

## II.   ARGUMENT

Section 1782 gives U.S. district courts the discretion to grant discovery in aid of foreign

and international legal proceedings over a person who resides or may be found within the

relevant court's district.  28 U.S.C. § 1782(a).

Section 1782 "liberalizes existing U.S. procedures for assisting foreign and international

tribunals and litigants in obtaining oral and documentary evidence in the United States." *In re*

*Letter of Request from Crown Prosecution Serv. Of U.K.,* 870 F.2d 686, 693 (D.C. Cir. 1989).

Although Section 1782 does not require courts to order discovery, it "authorizes a broad scope

for federal courts to assist in foreign proceedings[.]" *HT S.R.L. v. Velasco,* 125 F. Supp. 3d. 211,

219 (D.D.C. 2015); *accord Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247-48

(2004) (observing that the 1948 amendments to Section 1782 "substantially broadened the scope of assistance").

To decide whether to permit discovery under Section 1782, courts must determine (1) whether they have the authority to do so and (2) whether they should exercise their discretion to do so. *In re Barnwell Enters. Ltd.*, 265 F. Supp. 3d 1, 8 (D.D.C. 2017).

This Court has the authority to permit discovery pursuant to Section 1782 and should exercise its discretion to do so in this case. Moreover, the Court should do so *ex parte* because the Witnesses do not object to the discovery sought. In sum, this Court should authorize Tele Fácil to issue subpoenas for taking depositions of the Witnesses.

### A.   THIS COURT HAS THE AUTHORITY TO PERMIT DISCOVERY UNDER SECTION 1782.

A court has authority to permit discovery under Section 1782 if (1) "the person from whom the discovery is sought . . . is found" in its district; (2) "the discovery is for use in a proceeding before a foreign or international tribunal"; and (3) an "interested person" makes the application. *Valesco*, 125 F. Supp. 3d at 221-22. Tele Fácil meets each of these requirements.

#### 1.   The Witnesses are Found in the District of Columbia.

Mr. Feighery and Mr. Caplan are partners in the Washington, D.C. office of Arent Fox LLP, at 1717 K Street, NW, Washington, D.C. 20006, and are licensed to practice law in Washington, D.C. Rouleau Decl., Exs. 4-6. Mr. Mendieta is a Foreign Legal Consultant in the Washington, D.C. office of Innovista Law PLLC, at 1825 K Street, NW, Washington, D.C. 20006, and has applied to be a Foreign Legal Consultant in the District of Columbia (Application SLC #00297 in file number 297). Rouleau Decl., Exs. 7-8. Therefore, Mr. Feigherty, Mr. Caplan, and Mr. Mendieta are found in the Court's district.

2.    **Tele Fácil Seeks Discovery For Use in a Proceeding Before a Foreign Tribunal.**

Section 1782 empowers the Court to order a person to provide "testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted *before formal accusation.*"  28 U.S.C. § 1782(a) (emphasis added).  To meet this standard, "a proceeding need only be 'within reasonable contemplation,' not pending or imminent." *In re Veiga*, 746 F. Supp. 2d 8, 23 (D.D.C. 2010) (quoting *Intel*, 542 U.S. at 259).

In the near future, Tele Fácil will submit a Criminal Complaint to the Attorney General of Mexico's offices with respect to the aforementioned criminal acts.  *See* Felix Decl. ¶ 10.  Tele Fácil will use the requested discovery to support the allegations in a Criminal Complaint. *Id.* ¶ 18-19.  Tele Fácil's application falls squarely within Section 1782's scope.

3.    **Tele Fácil is an interested person.**

"No doubt litigants are included among, and may be the most common example of, the 'interested person' who may invoke § 1782." *Intel,* 542 U.S. at 256.  Tele Fácil will submit the Criminal Complaint as the offended party because the alleged intimidation and witness tampering damaged Tele Fácil by preventing Mr. Henkel from appearing as a witness in the NAFTA Proceeding.  Under Mexican law (and unlike U.S. law), the victim of a crime is a party in the ensuing proceedings. *See* Félix Decl. ¶ 12.  Thus, Tele Fácil is an "interested person" under Section 1782.

B.    **THIS COURT SHOULD EXERCISE ITS DISCRETION TO PERMIT DISCOVERY UNDER SECTION 1782.**

When a court has the authority to permit discovery under Section 1782, it decides whether to exercise that authority by weighing four factors: (1) whether the persons from whom

discovery is sought is "'outside the foreign tribunal's jurisdictional reach'"; (2) the "'nature'" of

the foreign tribunal, the "'character'" of the foreign proceedings, and the foreign tribunal's

"'receptivity'" to assistance from the court; (3) whether the discovery requested is a "concealed

'attempt to circumvent foreign proof-gathering restrictions'" or other foreign or U.S. policies;

and (4) whether the discovery requested is "'unduly intrusive or burdensome." *In re Barnwell*,

265 F. Supp. 3d at 9 (quoting *Intel,* 542 U.S. at 264-65). These factors favor granting Tele

Fácil's Application.

> **1.    Mr. Feighery, Mr. Caplan, and Mr. Mendieta are now, and will
> continue to be, outside of the Mexican judiciary's jurisdictional reach.**

Courts are more likely to grant applications for discovery under Section 1782 when the

person from whom discovery is sought is not a participant in the foreign proceeding because the

evidence "may be unobtainable absent section 1782(a) aid." *In re Barnwell*, 265 F. Supp. 3d at 9

(quoting *Intel,* 542 U.S. at 264).

Mr. Feighery, Mr. Caplan, and Mr. Mendieta likely are beyond the Mexican judiciary's

jurisdictional reach. None of them is a party to the NAFTA proceeding, and none will be a party

to the Criminal Complaint. None of them would be subject to the compulsory jurisdiction of the

Mexican courts. Accordingly, Tele Fácil seeks evidence beyond the jurisdictional reach of the

Mexican courts, which weighs in favor of granting the application.

> **2.    The nature and character of the Mexican proceedings and the extent
> to which the Mexican judiciary would be receptive to U.S. judicial
> assistance weigh in favor of granting this Application.**

This factor is comprised of a three sub-factors. *See Valesco*, 125 F. Supp. 3d at 223-25.

First, the nature of the foreign tribunal weighs against enforcing discovery "if the party seeking

the discovery had options in selecting the forum for the foreign proceeding." *Id.* at 223. Second,

the character of the foreign proceedings weighs against enforcing discovery if the foreign suit is

far along in the discovery process. *Id.* Finally, the foreign tribunal's receptivity to U.S. judicial

assistance generally weighs in favor of enforcing discovery absent "authoritative proof that a

foreign tribunal would reject evidence obtained under 28 U.S.C. § 1782(a)." *Id.* at 224 (internal

quotation marks omitted).

All three sub-factors weigh in favor of enforcing discovery in this case. First, IFT

officials allegedly committed the crime in Mexico, so Tele Fácil had to select a Mexican forum.

Second, the foreign suit has not even begun, let alone progressed into discovery. Third, there is

no reason to suspect that the Mexican judiciary would reject the evidence sought in this

Application. In Mexico, parties may submit evidence in support of a criminal complaint. Felix

Decl. ¶ 15. Neither this Application nor the evidence sought in this Application would violate

Mexican law. *Id.* at ¶ 14. To the contrary, Mexican courts may rely on Section 1782

applications to obtain relevant evidence. Felix Decl. ¶ 15. In sum, the nature and character of

the Mexican proceedings and the likelihood that the Mexican judiciary would welcome U.S.

judicial assistance weigh in favor of enforcing discovery.

### 3.   This Application is not a concealed attempt to circumvent restrictions on foreign discovery.

An applicant may not attempt to circumvent foreign discovery restrictions through

Section 1782(a). *In re Veiga*, 746 F. Supp. 2d at 8. That said, the applicant need not "first seek

discovery from the foreign tribunal." *Id.* In other words, "Section 1782(a) does not incorporate

an exhaustion requirement[.]" *Id.*

Tele Fácil is not seeking to circumvent Mexican discovery restrictions. Because the

Witnesses are not parties to the NAFTA Proceeding and will not be parties to the Criminal

Complaint, there may be no other way to get this information outside of an order from this Court.

If anything, Tele Fácil's Application is consistent with expanding protections for victims in the Mexican legal system. Recently, Mexico structurally amended its criminal system to transition from an "inquisitorial system into an accusatory system." Felix Decl. ¶ 7. Mr. Félix was the criminal law expert that led the efforts to draft the rules of the new system, embodied in the National Code of Criminal Procedures that was adopted and published by the Mexican Congress on March 5, 2014. *Id.* ¶ 2. The new accusatory system recognizes essential protections for the victim and offended parties and their participation in the process was raised to the level of a party. *Id.* ¶ 7. Now, there are three parties in a criminal process: the defendant, the prosecutor, and the victim. *Id.* The victim or offended party has the right to have an attorney as legal counsel, who may act in the same terms and in equal circumstances as the defense attorney. *Id.* For example, the victim or offended party's attorney may offer evidence and intervene in the investigation, and may appear at hearings and during the trial in equal circumstances as the defense attorney. *Id.*

Considering this, the evidence to be obtained from the depositions requested herein, rather than circumventing any discovery limitations, actually advances the purposes of the Mexican criminal system. *Id.* ¶ 15. Tele Fácil, as the offended party who will submit a Criminal Complaint, will be able to participate actively in the process by offering the depositions as relevant evidence, as intended by the new accusatory system. *Id.* ¶ 13.

### 4.    The Discovery Sought is not unduly intrusive or burdensome.

Courts assess the scope of the discovery sought under Section 1782(a) on a case-by-case basis. *See, e.g., In re Barnwell*, 265 F. Supp. 3d at 13-16; *Velasco*, 125 F. Supp. 3d at 227-28; *In re Veiga*, 746 F. Supp. 2d at 25-26.

The Application is narrowly tailored to seek only testimony relating to the Witnesses' meetings and communications with Mr. Henkel, in connection with the events discussed and litigated in the NAFTA Proceeding. *See* Rouleau Decl., Exs. 1-3. As noted above, the meetings and communications held with Mr. Henkel suggest that he was the victim of intimidation, and a criminal complaint should be submitted for the competent Mexican authority to start an investigation on these intimidation claims and witness tampering actions, that affected Tele Fácil and the NAFTA Proceeding. These communications, go to the heart of the reasons why the IFT acted as it did, which is one of the main issues pertinent to the NAFTA Proceeding.

Further, as reflected in the attached subpoenas, Tele Fácil has narrowly tailored their requests to specific time periods and to individuals it has actual knowledge occurred, which would be useful and relevant to the Criminal Complaint to be submitted. *See id.* As such, the requested documents are clearly discoverable under Section 1782.

## C.      THIS COURT SHOULD GRANT TELE FÁCIL'S REQUEST *EX PARTE.*

Frequently, courts grant leave to serve subpoenas under Section 1782(a) *ex parte. In re Porsche Automobil Holding SE*, No. 15-mc-417 (LAK), 2016 WL 702327, at *1 n.3 (S.D.N.Y. Feb. 18, 2016). Courts do so because parties may address any issues with "the propriety of the grant of leave" or "the content of the subpoenas" by moving to quash or defending against an application to compel compliance with the subpoenas. *Id.*; *see, e.g., Velasco*, 125 F. Supp. 3d at 217 (granting *ex parte* application before granting in part and denying in part motion to compel compliance); *In re Al Fayed*, 91 F. Supp. 2d 137, 137-38 (D.D.C. 2000) (granting *ex parte* application before granting motion to quash subpoena).

This Court should do the same here. Initially, as *In re Porsche* makes clear, Mr. Feigherty, Mr. Caplan, or Mr. Mendieta may address any issues with a motion to quash the

subpoenas or by opposing a motion to compel compliance with the subpoenas. But all of this is beside the point here: Mr. Feigherty, Mr. Caplan, and Mr. Mendieta have all attested that they do not object to the subpoenas. Therefore, to maximize expediency in obtaining this discovery, which will prove valuable to the Mexican authorities in considering a Criminal Complaint, this court should grant the application *ex parte*.

### III.   CONCLUSION

For the reasons stated herein, Tele Fácil respectfully requests that the Court:

(1)     Grant Tele Fácil's Application for discovery pursuant to 28 U.S.C. § 1782;

(2)     Authorize Tele Fácil, through undersigned counsel or their agents, to issue and

serve subpoenas to take discovery relating to the issued identified in this Application upon Mr.

Feighery, Mr. Caplan and Mr. Mendieta, in substantially the same form as attached to the

Declaration of Louis J. Rouleau as Exhibits 1-3; and

(3)     Direct the Witnesses to comply with the subpoenas in accordance with the Federal

Rules of Civil Procedure and the Rules of this Court.

Dated: March 13, 2018

Respectfully submitted,

Louis J. Rouleau (DC Bar No. 471654)
Womble Bond Dickinson (US) LLP
1200 Nineteenth Street NW
Suite 500
Washington, D.C. 20036

*Counsel for Applicant*
*Tele Fácil Mexico, S.A., De C.V.*

Pascal F. Naples (DC Bar No. 1047957)
*(application for admission pending)*
Womble Bond Dickinson (US) LLP
1200 Nineteenth Street NW
Suite 500
Washington, D.C. 20036

*Counsel for Applicant*
*Tele Fácil Mexico, S.A., De C.V.*